**WELLS FARGO BANK, N.A., and Wells Fargo Home Mortgage, Inc., Plaintiffs,**

v.

**Demetrios A. BOUTRIS, in his official capacity as Commissioner of the California Department of Corporations, Defendant.**

No. CIV.S–03–0157 GEB JF.

United States District Court, E.D. California.

May 9, 2003.

William L. Stern, Severson and Werson, San Francisco, CA, E. Edward Bruce, Pro Hac Vice, Stuart C. Stock, Pro Hac Vice, Robert A. Long, Jr., Pro Hac Vice, Keith A. Noreika, Pro Hac Vice, Covington and Burling, Washington, DC, for Plaintiffs.

Virginia Jo Dunlap, State of California Department of Corporations, Sacramento, CA, Judy Lynn Hartley, State of California Department of Corporations, Los Angeles, CA, for Defendant.

Horace G. Sneed, Office of the Comptroller of the Currency, Washington, DC, for Amicus.

## ORDER

BURRELL, District Judge.

Pending are cross-motions for summary judgment involving all claims in this action. This dispute concerns preemption under the National Bank Act ("the Act") of California's power to regulate an operating subsidiary of a national bank; whether a California official is liable for retaliation and 42 U.S.C. § 1983 claims for his exercise of state regulatory authority over that operating subsidiary; and, whether the Depository Institutions Deregulation Monetary Control Act of 1980 ("DIDMCA") preempts California's per diem interest statutes.[1]

Plaintiffs Wells Fargo Bank, N.A. ("Wells Fargo") and Wells Fargo Home Mortgage, Inc. ("WFHMI") move for summary judgment and a permanent injunction. Plaintiffs seek to permanently enjoin Defendant Demetrios Boutris, in his official capacity as the Commissioner of the California Department of Corporations ("Commissioner"), and his agents, "from exercising visitorial powers over Plaintiffs, or from otherwise preventing or interfer-

---

1. California's per diem statutes prohibit mortgage lenders from charging any interest on residential mortgages for a period in excess of one day prior to recordation of the mortgage or deed of trust. *See* Cal. Fin.Code § 50204(*o*); Cal. Civ.Code § 2948.5.

ing with WFHMI's operations in California." (Pls.' Memo. of P. & A. in Support of Mot. for Summ. J. ("Pls.' Memo.") at 3.) The Office of the Comptroller of Currency ("OCC") participated as *amicus curiae* in this case. The Commissioner opposes the motion and moves for summary judgment on all claims or in the alternative for partial summary judgment. (Def.'s Memo. of P. & A. in Support of Mot. for Summ. J. ("Def's Memo.") at 1.) The Commissioner also argues that Wells Fargo lacks standing since he is not seeking to exercise his regulatory authority over Wells Fargo. Wells Fargo rejoins it has standing because it makes residential mortgage loans through its operating subsidiary WFHMI and thus has sufficient interest in this action. Wells Fargo has standing.

The motions were argued May 5, 2003.

## BACKGROUND

Wells Fargo is a federally chartered national banking association that is organized and exists under the National Bank Act, 12 U.S.C. § 21 *et seq.* (Pls.' Statement of Undisputed Facts ("Pls.' SUF") ¶ 1.) WFHMI is a state-chartered corporation, which is a wholly owned operating subsidiary of Wells Fargo. (*Id.* ¶ 2; Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶ 3.) WFHMI makes more than $1 million in first-lien residential mortgage loans in California per year. (Pls.' SUF ¶¶ 3,5.) Since 1996 until sometime in 2003 WFHMI held licenses to engage in real estate lending activities under the California Residential Mortgage Lending Act ("CRMLA") and the California Finance Lenders Law ("CFLL").[2] (Def.'s SUF ¶ 5.)

The Commissioner is charged with enforcing the CRMLA, the CFLL, and California Financial Code § 50204(*o*) (a per diem statute) against CRMLA licensees. (*Id.* ¶ 6.) The Commissioner asserted regulatory, supervisory, examination and enforcement authority over WFHMI since it was a licensee under both the CRMLA and CFLL. (*Id.*) In August 2001 and at subsequent times, the Commissioner instituted regulatory examinations of WFHMI under the CFLL. (*Id.* ¶ 17; Pls.' Response to Def.'s SUF ¶ 17.)

On or about December 4, 2002, the Commissioner demanded that WFHMI conduct an audit of its residential mortgage loans made in California during 2001 and 2002. (Def.'s SUF ¶ 18.) The purpose of the audit was to identify all loans where WFHMI charged per diem interest in violation of California Financial Code § 50204(*o*), so that WFHMI could make appropriate refunds, and identify instances of understating finance charges in violation of the federal Truth in Lending Act. (*Id.*) WFHMI objected to the Commissioner's request in a letter dated January 22, 2003, in which it asserted because it is an operating subsidiary of a national bank it is subject to the OCC's exclusive regulatory authority. (*Id.* ¶ 20.)

Subsequently, on January 27, 2003, Plaintiffs filed this federal lawsuit against the Commissioner. The Commissioner instituted administrative proceedings to revoke WFHMI's licenses under CRMLA and CFLL on February 4, 2003. (*Id.* ¶ 23.) Plaintiffs unsuccessfully sought to enjoin those revocation proceedings.[3] Plaintiffs prevailed on the portion of their

---

**2.** At the May 5 hearing, Plaintiffs' counsel stated that subsequent to the March 10, 2003, preliminary injunction hearing in this action the Commissioner revoked WFHMI's CRMLA and CFLL licenses.

**3.** This portion of Plaintiffs' preliminary injunction motion was denied because Plain-

tiffs' argument that WFHMI was entitled to keep its California mortgage lending licenses even though WFHMI had not complied with its licensing requirements and asserted those licenses were unnecessary for it to conduct its mortgage lending business in California was found unpersuasive.

preliminary injunction motion which sought to enjoin the Commissioner from exercising visitorial powers over Plaintiffs or from otherwise preventing WFHMI from conducting mortgage lending business in California.

## DISCUSSION [4]

I. *Federal Preemption of the Commissioner's Exercise of Visitorial Powers over WFHMI*

At the May 5 hearing the Commissioner argued that notwithstanding his revocation of WFHMI's California licenses for its mortgage lending business in California, he still is authorized to exercise visitorial powers over WFHMI. Wells Fargo counters since the OCC is exercising federal visitorial powers over its operating subsidiary WFHMI, the Commissioner is preempted from exercising the same regulatory authority over WFHMI. (Pls.' Memo. at 3.) The OCC agrees with Plaintiffs' position, stating that "in its capacity as administrator of the national banking system ... [and] pursuant to 12 U.S.C. § 484 and federal regulations, the OCC has exclusive 'visitorial' power over national banks and their operating subsidiaries except where federal law specifically provides otherwise." [5] (OCC Amicus Br. at 2.) The OCC has promulgated 12 C.F.R.

§ 7.4006, which concerns its exclusive visitorial powers over national banks. Section 7.4006 provides, in pertinent part: "[u]nless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." Section 7.4006 considers an operating subsidiary of a national bank to be an "instrumentalit[y] of the federal government ... subject to the paramount authority of the United States." *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 561 (9th Cir.2002).

The Commissioner argues nothing in the Act empowered the OCC to issue § 7.4006. (Def.'s Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Opp'n") at 3.) The OCC counters Congress implicitly authorized it to promulgate this regulation in the incidental powers section of 12 U.S.C. § 24 (Seventh), the visitorial powers section in 12 U.S.C. § 484, and through acknowledgment in the Gramm–Leach–Bliley Act ("GLBA") that national banks can have operating subsidiaries. The OCC contends § 7.4006 preempts the Commissioner's authority to exercise visitorial powers over WFHMI.

Whether OCC's promulgation of § 7.4006 is within the sphere of authority

4. Summary judgment standards are well-known and will not be repeated unless relevant to a point decided.

5. "[T]he term 'visitorial' powers as used in section 484 generally refers to the power of the OCC to 'visit' a national bank to examine its activities and its observance of applicable laws, and encompasses any examination of a national bank's records relative to the conduct of its banking business as well as any enforcement action that may be undertaken for violations of law." (OCC Amicus Br. at 2–3.)

The term "visitorial" power [in section 484] has deep historical roots. "At common law the right of visitation was exercised by the

King as to civil corporations, ...." One of the earliest interpretations of the OCC's "visitorial power" within the context of ... the predecessor [statute] to the current section 484, stated:

"Visitation, in law, is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting its business, and enforce an observance of its laws and regulations.... [T]he word ['visitation' has been defined] to mean 'inspection; superintendence; direction; regulation.'"

*First Union Nat'l Bank v. Burke*, 48 F.Supp.2d 132, 144 (D.Conn.1999) (internal citations omitted).

delegated to it by Congress depends on Congressional intent gleaned from the Act. "Preemption may be either express or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (citation omitted).

> [When] explicit pre-emption language does not appear, or does not directly answer the question ... courts must consider whether the federal statute's "structure and purpose" or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent.... A federal statute, for example, may create a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." ... Alternatively, federal law may be in "irreconcilable conflict" with state law.... Compliance with both statutes, for example, may be a "physical impossibility," ...; or, the state law may "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (citations omitted). "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Federal Savings and Loan Ass'n,* 458 U.S. at 153–54, 102 S.Ct. 3014.

## A. National Bank Act

National banks are created and governed by the National Bank Act. The Act was enacted to "facilitate ... 'a national banking system,'" *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,* 439 U.S. 299, 314–15, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978)(quoting Cong. Globe, 38th Cong., 1st Sess., 1451 (1864)), and "to protect national banks against intrusive regulation by the States." *Bank of America,* 309 F.3d at 561. "The National Bank Act (12 U.S.C. § 21 et seq.) constitutes by itself a complete system for the establishment and government of national banks." *Deitrick v. Greaney,* 309 U.S. 190, 194, 60 S.Ct. 480, 84 L.Ed. 694 (1940) (quotations and citations omitted). The Act provides national banks shall have power

> [t]o exercise ... all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes....

12 U.S.C. § 24 (Seventh). The OCC is the administrator charged with supervision of the Act and bears "primary responsibility for surveillance of 'the business of banking' authorized by § 24 (Seventh)."[6] *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995); *see*

---

**6.** The Act authorizes the OCC to "appoint examiners who shall examine every national bank as often as the Comptroller of the Currency shall deem necessary. The examiner making the examination of any national bank shall have power to make a thorough examination of all the affairs of the bank and in doing so he shall have power to administer oaths and to examine any of the officers and agents thereof under oath and shall make a full and detailed report of the condition of said bank to the Comptroller of the Currency...." 12 U.S.C. § 481. "The provisions of the Act requiring periodic examinations and reports and the powers of the Comptroller are designed to insure prompt discovery of violations of the Act and in that event prompt remedial action by the Comptroller." *Deitrick,* 309 U.S. at 195, 60 S.Ct. 480.

12 U.S.C. §§ 1, 26–27, 481. The Act prescribes: "No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress. . . ." 12 U.S.C. § 484(a).

The Commissioner concedes the OCC's exclusive visitorial power over national banks, but insists that regulatory authority does not extend to WFHMI. The Commissioner asserts nothing in the Act authorizes the OCC to prescribe it has exclusive visitorial authority over operating subsidiaries of national banks. (Def.'s Opp'n at 3.) He argues since an operating subsidiary is not a national bank, it should not be granted all the rights and privileges of a national bank. (Def.'s Memo. at 7.) Plaintiffs counter "that operating subsidiaries conduct only activities that the national bank is authorized to conduct, and therefore function as separately incorporated divisions or departments of the national bank. . . ." (Pls.' Memo. at 7.) The OCC agrees with Plaintiffs stating, "When established in accordance with the procedures mandated by the OCC Operating Subsidiary Rule and approved by the OCC, the operating subsidiary is a federally-authorized means by which a national bank may conduct federally-authorized activities." (OCC Amicus Br. at 13.)

### B. *Operating Subsidiaries*

The OCC asserts that "[p]ursuant to [national banks'] authority under 12 U.S.C. § 24 (Seventh) to exercise 'all such incidental powers as shall be necessary to carry on the business of banking,' national banks have long used separately incorporated entities to engage in activities that the bank itself is authorized to conduct." (*Id.* at 11–12.) "Incidental powers [in § 24 (Seventh)] include activities that are 'convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act.'" *Bank of America*, 309 F.3d at 562 (citations omitted). The United States Supreme Court held that the "'business of banking' is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated. The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds." *NationsBank of North Carolina, N.A.*, 513 U.S. at 258, 115 S.Ct. 810 n. 2.

The OCC has promulgated an operating subsidiary rule in 12 C.F.R. § 5.34, which prescribes: "[a] national bank may conduct in an operating subsidiary activities that are permissible for a national bank to engage in directly either as part of, or incidental to, the business of banking, as determined by the OCC, or otherwise under other statutory authority. . . ." Section 5.34(e)(3) provides: "[a]n operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank." [7]

At the May 5 hearing, the Commissioner virtually conceded the OCC's construction

---

**7.** Before a national bank can be authorized to conduct permissible banking activities through an operating subsidiary, the bank must comply with the OCC's licensing requirements. Under 12 C.F.R. § 5.34(b), "A national bank must file a notice or application as prescribed in this section to acquire or establish an operating subsidiary, or to commence a new activity in an existing operating subsidiary." "The OCC reviews a national bank's application to determine whether the proposed activities are legally permissible and to ensure that the proposal is consistent with safe and sound banking practices and OCC policy and does not endanger the safety or soundness of the parent national bank." *Id.* § 5.34(e)(5)(iii).

of 12 U.S.C. § 24 (Seventh) as authorizing national banks to conduct the business of banking through operating subsidiaries is entitled to deference by stating this construction is "probably" reasonable in light of *NationsBank of North Carolina, N.A.*, 513 U.S. at 258 n. 2, 115 S.Ct. 810. (Reporter's Transcript ("RT") at 30.) However, the Commissioner insisted that this statute does not authorize the OCC to exercise exclusive visitorial powers over operating subsidiary entities. The Commissioner's equivocal position on whether the OCC can authorize national banks to conduct banking business through operating subsidiaries requires the issue to be decided.

Both parties cite to the GLBA's definition of "financial subsidiary" as support for their respective positions on whether the Act empowers a national bank to conduct banking business through an operating subsidiary. Plaintiffs and the OCC argue Congress acknowledged national banks' authority to conduct banking business in this manner in the GLBA's definition of "financial subsidiary." The Commissioner counters that definition evinces Congress never intended national banks to conduct business through operating subsidiaries.

The Commissioner's reliance on this definition is misplaced. The "financial subsidiary" definition recognizes that "operating subsidiaries" could exist by stating a " 'fi-nancial subsidiary' . . . is . . . other than a subsidiary that . . . engages solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks." 12 U.S.C. § 24a(g)(3). Not only does this language reference operating subsidiaries, it indicates the OCC exercises visitorial authority over them. A Senate Report explaining the scope and purpose of the GLBA explicitly addresses the use of operating subsidiaries by national banks:

> For at least 30 years, national banks have been authorized to invest in operating subsidiaries that are engaged only in activities that national banks may engage in directly. For example, national banks are authorized directly to make mortgage loans and engage in related mortgage banking activities. Many banks choose to conduct these activities through subsidiary corporations. Nothing in this legislation is intended to affect the authority of national banks to engage in bank permissible activities through subsidiary corporations, or to invest in joint ventures to engage in bank permissible activities with other banks or nonbank companies.

S.Rep. No. 106–44, at 8 (1999).[8]

Moreover, court decisions determining whether a particular activity is permissible

---

**8.** The OCC also recognized several years ago, in 1966, that national banks are empowered *to conduct authorized banking business through subsidiaries* by its announcement in the Federal Register:

> The Comptroller of the Currency has confirmed his position that a national bank may acquire and hold the controlling stock interest in a subsidiary operations corporation. . . . A subsidiary operations corporation is a corporation the functions or activities of which are limited to one or several of the functions or activities that a national bank is authorized to carry on.
>
> \* \* \* \* \* \*
>
> [T]he authority of a national bank to purchase or otherwise acquire and hold stock of a subsidiary operations corporation may properly be found among 'such incidental powers' of the bank 'as shall be necessary to carry on the business of banking,' within the meaning of 12 U.S.C. 24(7), or as an incident to another Federal banking statute which empowers a national bank to engage in a particular function or activity. . . . The visitorial powers vested in this Office are

for a national bank have treated the activities of an operating subsidiary as being equivalent to the activities of the national bank. *See NationsBank of North Carolina, N.A.*, 513 U.S. at 254, 115 S.Ct. 810 (brokerage subsidiary acting as an agent in the sale of annuities); *Marquette Nat'l Bank of Minneapolis*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (credit card subsidiary); *American Ins. Ass'n v. Clarke*, 865 F.2d 278 (D.C.Cir.1988) (subsidiary offering municipal bond insurance); *M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377 (9th Cir.1977) (motor vehicle leasing by subsidiary). It is pellucid that " 'the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking.' " *Bank of America*, 309 F.3d at 563 (citation omitted). It is also clear "that the OCC has been delegated the authority to determine, with . . . considerable discretion[ ]," whether national banks may conduct banking business through operating subsidiaries. *Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488, 493 (5th Cir.2003).

■ The OCC's regulation authorizing national banks to conduct permissible banking business activities through operating subsidiaries is within its discretionary authority delegated to it by Congress and is a reasonable interpretation of the Act. Since the OCC's "determination as to what

activities are authorized under the National Bank Act [is to] be sustained if reasonable," *First Nat'l Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775, 777–78 (8th Cir.1990), Plaintiffs prevail on their position that WFHMI is an operating subsidiary of a national bank.

### C. OCC's Exclusive Visitorial Powers Over Operating Subsidiaries

Notwithstanding Wells Fargo's right to conduct business through an operating subsidiary, the Commissioner argues he has visitorial powers over WFHMI by virtue of state law, which the OCC seeks to extinguish by impermissibly asserting exclusive visitorial powers. The OCC asserts "[b]ecause federal law prohibits the [Commissioner] from exercising visitorial powers over a national bank engaged in real estate lending pursuant to federal law, the [Commissioner] may not exercise visitorial power over the national bank conducting that activity through an operating subsidiary licensed by the OCC, absent federal law dictating a contrary result." [9] (OCC Amicus Br. at 14.)

■ The issue is whether the OCC was empowered under the Act to enact 12 C.F.R. § 7.4006, which prescribes: "State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." [10] Section 7.4006 is to be upheld if it is " 'a

adequate to ascertain compliance by bank subsidiaries with the limitations and restrictions applicable to them and their parent national banks.

Acquisition of Controlling Stock Interest in Subsidiary Operations Corporation, 31 Fed. Reg. 11,459 at 11,459–60 (Aug. 31, 1966). This interpretative pronouncement reflected OCC's then-held view on existing law. *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C.Cir.1952) ("Administrative officials frequently announce their views as to the meaning of statutes or regulations.").

**9.** Under 12 U.S.C. § 371, national banks "may make, arrange, purchase or sell loans

or extensions of credit secured by liens on interests in real estate . . . ."

**10.** Section 7.4006, considered in conjunction with 12 C.F.R. § 5.34(e)(3) and 12 U.S.C. § 484, evinces that the OCC is exercising exclusive visitorial powers over operating subsidiaries. Section 5.34(e)(3) provides: "If, upon examination, the OCC determines that the operating subsidiary is operating in violation of law, regulation, or written condition, or in an unsafe or unsound manner or otherwise threatens the safety or soundness of the bank, the OCC will direct the bank or operating subsidiary to take appropriate remedial action, which may include requiring the bank

reasonable interpretation of § 24 (Seventh).'" *Bank of America*, 309 F.3d at 562 (citation omitted). Since the OCC is the regulator of national banks and administrator of the Act, its position on its authority to enact § 7.4006 is entitled to "'great weight.'" *Id.* It is plain that the Act delegated the OCC the authority to promulgate § 7.4006 and § 7.4006 reflects a reasonable construction of the Act.

Because WFHMI "is treated as a department or division of its parent [national bank] for regulatory purposes," the Commissioner lacks visitorial power over WFHMI just as it lacks visitorial power over WFHMI's national bank parent. *WFS Financial, Inc. v. Dean*, 79 F.Supp.2d 1024, 1026 (W.D.Wis.1999); *see* 12 U.S.C. § 484 (prescribing that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law . . ."); *see also Nat'l State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 988 (3d Cir.1980) (indicating that where allowing a state agency to exercise visitorial powers over an instrumentality of a national bank would "result in unnecessary and wasteful duplication of effort on the part of the bank and the state agency," it is "reasonable and practical" for visitorial powers to be exercised exclusively by a federal agency). "State attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties." *Bank of America*, 309 F.3d at 561. Therefore, the Commissioner has no visitorial powers over WFHMI.

### D. *Preemption Violates California's Sovereignty Under the Tenth Amendment*

■ The Commissioner further argues that "[b]y promulgating regulations seeking to regulate operating subsidiaries of national banks to the exclusion of states, the OCC is interfering with California's constitutional sovereignty under the Tenth Amendment and taking away the state's power to regulate and enforce its laws against state-chartered corporations such as WFHMI." (Def.'s Memo. at 10.) When WFHMI became an OCC authorized operating subsidiary of a national bank it ceased being subject to the visitorial power of the Commissioner and became regulated by the OCC. This change in regulatory authority from the Commissioner to the OCC has not been shown to infringe California's rights under the Tenth Amendment.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People." It has long been recognized that the Constitution authorizes Congress to establish national banks. *See M'Culloch v. State*, 17 U.S. 316, 424–25, 4 Wheat. 316, 4 L.Ed. 579 (1819). The National Bank Act's effect of "carv[ing] out from state control supervisory authority" over an OCC-authorized operating subsidiary of a national bank does not violate California's Tenth Amendment rights. *First Union Nat'l Bank v. Burke*, 48 F.Supp.2d 132, 148 (D.Conn.1999).

> Under the national banking regulatory scheme, Congress does not direct the state executive to affirmatively function in any particular way, nor does the OCC's exercise of exclusive visitorial powers over national banks preclude the state statutory enactments from being applied to national banks, provided they are not in conflict with and thus preempted by federal banking laws. By creating such a scheme, Congress has not seized the machinery of state gov-

to divest or liquidate the operating subsidiary, or discontinue specified activities."

ernment to achieve federal purposes. The relegation of regulatory and supervisory authority over federal instrumentalities to a single federal regulator does not interfere with the Commissioner's enforcement of state law against state banks, does not interfere with the state's enactment of non-preempted state banking laws applicable to national banks, does not preclude the Commissioner from seeking OCC enforcement of state laws, and expressly leaves available judicial remedies to compel national bank compliance with state law.

*Id.* at 148–49; *see Clark v. U.S.,* 184 F.2d 952, 954 (10th Cir.1950) ("Congress has the power to enact legislation for the protection, preservation and regulation of [national banks]" (citing *Westfall v. United States,* 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036 (1927); *Farmers' and Mechanics' Nat'l Bank v. Dearing,* 91 U.S. 29, 1 Otto 29, 23 L.Ed. 196 (1875); *M'Culloch,* 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579; *Doherty v. United States,* 94 F.2d 495, 497 (8th Cir.1938); *Weir v. United States,* 92 F.2d 634, 636 (7th Cir.1937))). Therefore, the OCC's regulation prescribing that it has exclusive visitorial powers over operating subsidiaries of national banks does not violate California's constitutional sovereignty under the Tenth Amendment.

For the stated reasons, Plaintiffs' motion for summary judgment is granted on their claim that the Act preempts the Commissioner from exercising visitorial powers over WFHMI, a wholly-owned operating subsidiary of Wells Fargo, licensed by the OCC to engage in real estate lending activities in California.[11]

## II. *Preemption of California's Per Diem Statutes by Depository Institutions Deregulation and Monetary Control Act of 1980*

Plaintiffs also contend California's per diem statutes cannot be enforced against WFHMI because DIDMCA expressly preempts them. Under DIDMCA,

> The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is—
>
> (A) secured by a first lien on residential real property...
>
> (B) made after March 31, 1980; and
>
> (C) [a federally related mortgage loan.]

12 U.S.C. § 1735f–7a(a). A "federally related mortgage" "(1) is secured by residential real property designed principally for the occupancy of from one to four families; and (2)...(D) is made in whole or in part by any 'creditor', as defined in section 1602(f) of Title 15, who makes or invests in residential real estate loans aggregating more than $1,000,000 per year." 12 U.S.C. § 1725f–5(b). A "creditor" is:

> a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

---

**11.** The Commissioner also argues that 12 C.F.R. § 7.4006 cannot be applied retroactively but that argument is mooted by the preemptive ruling on California's per diem statutes, which are the only statutes at issue with respect to the regulatory dispute over which entity is authorized to exercise visitorial powers over WFHMI.

15 U.S.C. § 1602(f). WFHMI is a creditor within the meaning of the statute. (Pls.' SUF ¶ 4.) States were able to override DIDMCA's express preemption by explicitly opting out of its terms prior to April 1, 1983. *Id.* § 1735f–7a(b)(2). California did not opt out of the DIDMCA's express preemption within the statutorily prescribed time period. (Pls.' SUF ¶ 6.)

California's per diem statutes prohibit interest from being charged on loaned mortgage funds for a period in excess of one day prior to recording of the mortgage. Cal. Civ.Code § 2948.5; Cal. Fin. Code § 50204(*o*). California Civil Code § 2948.5 provides, "[a] borrower shall not be required to pay interest on a principal obligation under a promissory note secured by a mortgage or deed of trust on real property improved with between one to four residential dwelling units for a period in excess of one day prior to recording of the mortgage or deed of trust if the loan proceeds are paid into escrow . . . ." In addition, under the CRMLA, a licensee may not "[r]equire a borrower to pay interest on the mortgage loan for a period in excess of one day prior to recording of the mortgage or deed of trust," except under certain circumstances that are not relevant to the present action. Cal. Fin.Code § 50204(*o*).

Plaintiffs argue California's per diem statutes expressly limit the amount of interest that a lender may collect on federally related mortgage loans and are therefore preempted by the DIDMCA. (Pls.' Memo. at 18–19.) Plaintiffs support their position by relying primarily on *Shelton v. Mutual Savings and Loan Ass'n,* 738 F.Supp. 1050 (E.D.Mich.1990). In *Shelton,* the plaintiffs argued defendant Bank "violated the Michigan usury statute, M.C.L. sections 438.31c(2) and (9), by charging interest before the loan proceeds were disbursed." *Id.* at 1053. The court explained, "the broadest possible interpretation of the exemption from state usury laws is consistent with the legislative purpose [of DIDMCA]," and therefore held Michigan's usury law was preempted by DIDMCA. *Id.* at 1057–58.

The Commissioner argues that the per diem statutes are unrelated to the California Usury Law [12] and "do nothing more than compel a close relationship between the date interest charges begin and the date of recordation of the deed of trust." (Def.'s Memo. at 26.) Further, the Commissioner contends the purpose behind the per diem statutes' limitation on interest charges "is to protect the consumer from paying interest on money that has not bought him the benefit of his bargain." [13]

---

**12.** California's usury law is found in California Constitution, Article XV, § 1.

**13.** During the May 5 hearing, light was shed on the usurious nature of California's per diem interest statutes and the benefit of the bargain the statutes are designed to help borrowers realize. At the hearing the Commissioner's counsel was asked, "What's a usury law?" In response he said, "I think [it] is a cap or ceiling on the actual amount—the actual rate of interest charged . . . ." (RT at 9.) During the exchange with the Commissioner's counsel, he argued that "the benefit of the bargain is buying the house, i.e., getting clear title to the house, getting to live in the house, the keys to the house, really the issue is that

that benefit only accrues or occurs when recordation occurs." It is—I would doubt very much that most banks would let me move into a house before they've recorded their mortgage on that house. (RT at 11.)

Further, the Commissioner's counsel argued that California's per diem statute seeks to encourage mortgage lenders to "keep the process moving fast . . . by limiting the interest to one day." (RT at 15–16.) When counsel was questioned about admitting that the statute limits the amount of interest, he said he mis-spoke and instead intended to use the word "controls," "because . . . this statute basically sets when the lender can begin to compute the interest on the loan." (RT at 16.)

(*Id.*) Plaintiffs counter that DIDMCA is not limited to preempting only state usury statutes, arguing "if Congress had intended DIDMCA's preemption laws to apply only to a subset of state laws limiting the rate or amount of interest, Congress would have said so." (Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Opp'n") at 17.)

DIDMCA preempts "[t]he provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved..." on particular types of loans. 12 U.S.C. § 1735f–7a(a). The language of the statute does not expressly limit the preemptive scope of DIDMCA to state usury laws. But the relevant legislative history makes clear that Congress just intended to create a limited preemption of state usury laws. *See Brown v. Investors Mortgage Co.*, 121 F.3d 472, 476 (9th Cir.1997) ("Congress made specific findings that modification of state usury laws was necessary for a stable national financial system."). The Senate Report that accompanied the bill containing what became 12 U.S.C. § 1735f–7a provides:

> In order to ease the severity of the mortgage credit crunches of recent years and to provide financial institutions, particularly those with large mortgage portfolios, with the ability to offer higher interest rates on savings deposits, H.R. 4986 as reported by the Committee would preempt any state constitutional or statutory provision setting a limit on mortgage interest rates....
>
> H.R. 4986 as amended provides for a limited preemption of state usury laws. It provides that the state constitutional or statutory restrictions on the amount

of interest, discount points or other charges on any loan, mortgage or advance secured by real estate which is described in section 527(B) of the National Housing Act are exempt from usury ceilings....

> The Committee believes that this limited modification in state usury laws will enhance the stability and viability of our nation's financial system and is needed to facilitate a national housing policy and the functioning of a national secondary market in mortgage lending....
>
> In exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers.

S.Rep. No. 96–368, at 18–19 (1979), *reprinted in* 1980 U.S.C.C.A.N. 236, 254–55.

■ Plaintiffs contend the Commissioner's argument that the per diem statutes are not usury laws "is essentially a tautology, since usury laws are defined as 'collectively, the laws of a jurisdiction regulating the charging of interest.'" (Pls.' Opp'n at 17 (quoting Black's Law Dictionary 1545 (6th ed.1990)).) "Usury is the receiving, securing, or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by law, the exaction of a greater sum for the use of money than the highest rate of interest allowed by law." 45 Laura Dietz & Anne M. Payne, *American Jurisprudence, Interest and Usury* § 2 (2d ed.2002); *see also Bernie's Custom Coach v. Small Business Admin.*, 987 F.2d 1195,

---

The Commissioner's shift in analytic focus from the per diem statutes limiting interest to one day to the word "controls" cannot be squared with his position on the real goal of the statutes, which is to prevent the lender from collecting interest on loaned mortgage funds in excess of one day prior to recordation.

1197 (5th Cir.1993) ("A usurious contract consists of a loan of money 'which requires a greater interest than allowed by law.' "). In California, "usury" has been defined as "taking more than the law allows upon a loan or for forbearance of a debt." *Hall v. Beneficial Finance Co.,* 118 Cal.App.3d 652, 654, 173 Cal.Rptr. 450 (1981) (citation omitted). By prohibiting lenders from commencing to charge interest on loaned mortgage funds until one day prior to recordation, California's per diem statutes constitute usury laws.

Nevertheless, the Commissioner argues California's per diem statutes do not fall within the preemptive scope of DIDMCA because they are designed to protect consumers and do not expressly limit interest rates or amounts. (Def.'s Memo. at 28.) The Commissioner compares California's per diem statutes with the simple interest statute ("SIS") that was held not preempted by DIDMCA in *Grunbeck v. Dime Savings Bank of New York,* 74 F.3d 331 (1st Cir.1996). The SIS requires that any interest rate or amount agreed to by the parties be computed on a "simple interest" basis. *Grunbeck,* 74 F.3d at 337. The court explained,

> [t]he SIS … does not "serve to … restrain" either the rate or the amount of simple interest which may be obtained, since the lender remains free to compensate by increasing the simple interest rate. Thus, the SIS does not "expressly" limit "the rate or amount of interest." Nor, in the alternative, does the SIS—as distinguished from market forces—"limit" the rate or amount of interest if "limit" means a "final, utmost or furthest boundary" on the rate or amount of interest, since the SIS imposes no ceiling whatsoever on either the

rate or amount of simple interest that may be exacted.

*Id.* at 338 n. 6.

Plaintiffs retort *Grunbeck* is factually distinguishable. Unlike the SIS, California's per diem interest restriction does not leave "entirely to the parties the rate and amount of … interest to be exacted" because once the lender and borrower's loan transaction is finalized, the lender has no way of collecting interest on loaned mortgage funds that would have been collected absent delays in recording the deed of trust. *Grunbeck,* 74 F.3d at 337. WFHMI is unable to bargain for a higher interest rate to compensate it for the possible delay in recordation of the mortgage or deed of trust because such delay is typically caused by the actions of others: the settlement agents, the escrow company, and the county clerk who records the mortgage. Thus the statute in *Grunbeck* simply limited the manner in which the lender expressed its interest rate without limiting the total amount of interest charged over the course of the loan. In contrast, California's per diem statutes prevent the lender from charging a specific pre-determined amount of interest over the course of the loan by tying the total amount of interest charged to events outside the lender's control which will not occur until after the loan is made.

Plaintiffs further contend the per diem interest statutes do not protect consumers by ensuring they receive the benefit of their bargain because "the purpose of recording the deed of trust is to protect the lender, not the borrower." (Pls.' Opp'n at 15.) Therefore, "a delay in recording the deed of trust does not deprive the borrower of the 'benefit of his bargain' with the lender." (*Id.*)

The Commissioner's argument that the per diem statutes are designed to protect consumers from unseen costs is unpersuasive.[14] Once the lender distributes funds

---

**14.** The Commissioner has also argued that this limitation is permitted under the DIDM-

CA's exception for "other charges," but it is

to the borrower, the borrower has received the "benefit of the bargain." The act of recordation of the mortgage or deed of trust simply provides "constructive notice" of the contents of the recorded documents to third parties. *See Domarad v. Fisher & Burke, Inc.,* 270 Cal.App.2d 543, 554, 76 Cal.Rptr. 529 (1969) ("The purpose of the recording statutes is to give notice to prospective purchasers or mortgagees of land of all existing and outstanding estates, titles or interest, whether valid or invalid, that may affect their rights as bona fide purchasers.").

Yet DIDMCA preempts only those state laws "expressly limiting the rate or amount of interest . . ." charged on particular residential mortgage loans. 12 U.S.C. § 1735f–7a(a). "When engaged in the task of statutory interpretation, 'courts . . . should . . . attempt to give meaning to each word and phrase.'" *Grunbeck,* 74 F.3d at 338 (citation omitted). Thus, the question is whether the per diem statutes expressly place a ceiling on interest rates or amounts. California's per diem statutes limit the time during which interest can be charged by prohibiting a lender from charging interest on loaned mortgage funds for a period in excess of one day prior to recordation of the mortgage. Cal. Civ.Code § 2948.5; Cal. Fin.Code § 50204(*o*). By restricting the time period in which a lender may collect interest on loaned mortgage funds, the language of the per diem statutes "expressly limit[s] the rate or. amount of interest. . . which may be charged . . . ." Therefore, DIDMCA preempts California's per diem statutes. Plaintiffs' motion for summary judgment on this claim is granted.

## III. *Retaliation Claim*

The Commissioner argues his entitlement to summary judgment on Plaintiffs' retaliation claim, contending the record

shows he did not institute administrative revocation proceedings to revoke WFHMI's CRMLA and CFLL licenses in retaliation for Plaintiffs' filing this federal lawsuit against his regulatory authority over WFHMI. Under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), even if Plaintiffs show that the Commissioner's licensing revocation decision was motivated by Plaintiffs' filing this federal lawsuit, the Commissioner could still prevail on his motion if he demonstrates the absence of a genuine issue of material fact as to whether he would have reached the same decision even in the absence of Plaintiffs' filing this lawsuit.

### A. *Undisputed Facts Applicable to Retaliation Claim*

The uncontroverted evidence shows since 1996 until some time in 2003, WFHMI held CRMLA and CFLL licenses, which WFHMI used to engage in real estate lending activities in California. These licenses required WFHMI to comply with the Commissioner's regulatory authority. *See* Cal. Fin.Code § 50124(a)(7).

Since August 2001, the Commissioner has conducted examinations of WFHMI under the CRMLA without any objection from WFHMI and commenced three examinations under CFLL. On or about December 4, 2002, the Commissioner demanded that WFHMI submit to an audit of its residential mortgage loans made in California during 2001 and 2002, so he could identify whether loans existed where per diem interest was charged in violation of California law. Between December 2002 and January 2003, Plaintiffs' counsel requested and received more time to respond to the Commissioner's demand. On or about January 17, 2003, the Commis-

---

pellucid that the per diem statutes cover inter-   est, not other charges.

sioner sent a letter to WFHMI's counsel requesting WFHMI's compliance with the audit demand by January 23, 2003.

On or about January 22, 2003, WFHMI sent a letter to the Commissioner objecting to his request, and expressly stating since WFHMI is an operating subsidiary of a national bank it is only subject to the OCC's visitorial powers. Plaintiffs subsequently sued the Commissioner in this federal lawsuit, alleging federal preemption claims and seeking "to prevent the Commissioner from requiring WFHMI to be licensed in order to operate lawfully in California, or in the alternative, from taking away those [California] licenses." (First Am. Compl. ¶ 3.)

On February 4, 2003, the Commissioner instituted two separate administrative proceedings to revoke WFHMI's CRMLA and CFLL licenses, based on the Commissioner's findings that WFHMI violated Financial Code §§ 50204, subdivisions (i), (j), (k) and (o) and 50307(b). The Commissioner opined that a fact or condition existed, which if known at the time of original licensure, would have justified the Commissioner's refusal to issue the license; and that therefore the information constituted grounds to revoke WFHMI's licenses. Because of the Commissioner's institution of license revocation proceedings, Plaintiffs added a retaliation claim to their Complaint.

### B. *Ruling on Retaliation Claim*

■ Plaintiffs have not presented facts controverting the Commissioner's evidentiary showing that he was going to exercise his regulatory authority over WFHMI whether or not it challenged him in a lawsuit, and that his decision to invoke licensing revocation proceedings against WFHMI was not "infected with a retaliatory motive traceable to [Plaintiffs' filing this federal action]." *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1141 (4th Cir.1990).

Summary judgment jurisprudence required Plaintiffs to controvert the Commissioner's evidentiary showing (that his licensing revocation decision was not infected by a retaliatory motive) with more evidence than the evidence indicating that the federal lawsuit played a role or was a motivating factor in the licensing revocation decision. Plaintiffs were obligated to show that "but for" the filing of this federal lawsuit the Commissioner would not have taken the alleged retaliatory action. *Id.* at 1140. The Commissioner points to WFHMI's violation of California Financial Code §§ 50204(i),(j),(k) and (o), 50307(b), and WFHMI's refusal to submit to his regulatory authority notwithstanding its obligation to do so as a California licensee as justification for his initiation of the license revocation proceedings. Since a jury could not reasonably find "the requisite 'but for' causation," the Commissioner's summary judgment motion on Plaintiffs' retaliation claim is granted. *Id.*

### IV. *§ 1983 and § 1988 Claims*

The Commissioner also argues that Plaintiffs' claims in counts I–III of their Complaint are not actionable under § 1983 because they are premised solely upon preemption, which will not support a § 1983 action. The Commissioner contends since Plaintiffs have not established a § 1983 claim, Plaintiffs' requests for attorney's fees under § 1988 is also unavailing.

The Commissioner relies primarily on *White Mountain Apache Tribe v. Williams*, 810 F.2d 844 (9th Cir.1985), where the Ninth Circuit held, "although the Supremacy Clause can be used to enjoin enforcement of a state statute that runs afoul of a federal legislative scheme, it does not provide a basis for a claim

under section 1983." *Western Air Lines, Inc. v. Port Authority of New York and New Jersey*, 817 F.2d 222, 226 (2d Cir. 1987) (discussing the holding in *White Mountain.*)

The primary function of the Supremacy Clause is to define the relationship between state and federal law. It is essentially a power conferring provision, one that allocates authority between the national and state governments; thus, it is not a rights conferring provision that protects the individual against government intrusion. The distinction between the two categories of constitutional controls has been enunciated by Professor Choper:

When a litigant contends that the national government (usually the Congress, but occasionally the executive, either alone or in concert with the Senate) has engaged in activity beyond its delegated authority, or when it is alleged that an attempted state regulation intrudes into an area of exclusively national concern, the constitutional issue is wholly different from that posed by an assertion that certain government action abridges a personal liberty secured by the Constitution. The essence of a claim of the latter type—which falls into the individual rights category of constitutional issues ...—is that no organ of government, national or state, may undertake the challenged activity. In contrast, when a person alleges that one of the federalism provisions of the constitution has been violated, he implicitly concedes that one of the two levels of government—national or state—has the power to engage in the questioned conduct. The core of the argument is simply that the particular government that has acted is the constitutionally improper one. To put it another way, a federalism attack on conduct of the national government contends that only the states may so act; a federalism challenge to a state practice asserts that only the central government possesses the exerted power; neither claim denies government power altogether....

We believe that § 1983 was not intended to encompass those constitutional provisions which allocate power between the state and federal government.

*White Mountain Apache Tribe*, 810 F.2d at 848.

Plaintiffs counter that the viability of their § 1983 claims is governed by the United States Supreme Court's decision in *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), which Plaintiffs contend abrogated the holding in *White Mountain Apache Tribe.* In *Golden State*, "the Supreme Court held that an enforceable statutory 'right' arises when (1) the plaintiff is an intended beneficiary of the statutory provision at issue, (2) the statute creates a binding obligation rather than merely a congressional preference for a certain kind of conduct, and (3) the plaintiff's interest is not so vague and amorphous as to be beyond the competence of the judiciary to enforce." *Eric L. By and Through Schierberl v. Bird*, 848 F.Supp. 303, 308 (D.N.H.1994) (*citing Golden State*).

Only the third element is decided since Plaintiffs' assertion of preemption interests in this case conflates WFHMI's federal interests with the state obligations WFHMI had as a California licensee in a manner that causes Plaintiffs' federal interests to lack a judicially manageable standard. In this lawsuit, Plaintiffs prosecuted conflicting claims: WFHMI held California licenses that subjected it to the Commissioner's visitorial powers to which it refused to submit and yet it fought the Commissioner's attempt to revoke those California licenses. The essence of the position WFHMI took was that it could

renege on its California licensing requirements and yet continue to be a California licensee, because as an instrumentality of a national bank, it could operate in California under the OCC's licensing and exclusive visitorial powers.

■ In light of the context in which Plaintiffs' allege § 1983 claims, the judiciary is ill-equipped by the Act's terms to determine the contours of those claims. Therefore, the Commissioner prevails on this issue.

Additionally, since Plaintiffs' § 1983 claim in count IV is premised on the retaliation that has been adjudicated in favor of the Commissioner, no § 1983 claims remain in this action. Since Plaintiffs' attorney's fees claim under 42 U.S.C. § 1988 is dependent on the § 1983 claims that have been decided in the Commissioner's favor, the § 1988 claim is dismissed.

### V. *Permanent Injunction*

#### A. *Applicable Standards*

"The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir. 1996). "[To] meet this standard, the plaintiffs must establish actual success on the merits, and that the balance of equities favors injunctive relief." *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir.1998). Where an injunction is sought against an agency of state government, the injunction must be scrutinized closely "to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law." *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir.1995). "This requires both that there be a determination that the conduct of the [Commissioner] violates federal constitutional law... and

that the scope of the injunction is no broader than necessary to provide complete relief to the named plaintiffs...." *Easyriders Freedom F.I.G.H.T.*, 92 F.3d at 1496.

#### B. *Irreparable Harm and Inadequate Remedy at Law*

As already discussed, Plaintiffs have established actual success on the merits of their preemption claims. In addition, they are able to show "the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." *Id.* at 1495. The Commissioner has represented that "[e]ven if a claim of federal preemption were made, Article III, Section 3.5 of the California Constitution mandates that the Commissioner enforce the laws under his jurisdiction until an appellate court has made a determination that the enforcement of the law is prohibited by federal law or regulation." (Def.'s Memo. at 35.) Therefore, despite this Court's ruling on the present motion, the Commissioner may still attempt to exercise visitorial powers over Plaintiffs and seek to enforce California's per diem statutes against them. Such action would significantly disrupt Plaintiffs' business activities and cause substantial irreparable economic loss.

Since Plaintiffs have shown the relevant provisions of the California law are preempted by federal law and that they will suffer irreparable harm if the Commissioner is not enjoined from enforcing those provisions, then "the question of harm to [California] and the matter of the public interest drop from the case, for [Plaintiffs] will be entitled to injunctive relief, [since] ... the public interest will perforce be served by enjoining the enforcement of the [preempted] provisions of state law." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847–48 (8th Cir.1999). Therefore, Plaintiffs' motion for a permanent

injunction is granted. Accordingly, the Commissioner and agents acting on behalf of the Commissioner are enjoined from exercising visitorial powers over Plaintiffs and from enforcing California Financial Code § 50204(*o*) and California Civil Code § 2948.5 against Plaintiffs.

The Clerk of the Court is directed to enter judgment in favor of Plaintiffs on their Supremacy Clause preemption claims and in favor of the Commissioner on Plaintiffs' retaliation, § 1983, and § 1988 claims.

IT IS SO ORDERED.